**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-1268-WJM

LORENA GARCIA,
LORENA FOR COLORADO,

    Plaintiffs,

v.

JENA GRISWOLD, Colorado Secretary of State, in her official capacity,

    Defendant.

## <u>AMENDED</u> ORDER DENYING PRELIMINARY INJUNCTION

Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") (ECF No. 7), asking the Court to order Colorado Secretary of State Jena Griswold ("Secretary") to place Plaintiff Garcia on the primary election ballot as a Democratic candidate for U.S. Senate. Plaintiffs brought this motion on May 6, 2020, which was the same day that the Secretary was required to certify the ballot. At 6:15 PM on May 7, 2020, the Court issued a four-page summary order denying the Motion, stating that "a detailed written order [will follow] in due course." (ECF No. 12 at 1.) This is that order.

Although the May 7 deadline and primary election have passed, this Order is entered *nunc pro tunc* to May 7, 2020, so that the Order accurately reflects the circumstances facing the Court at the time that it ruled. For the reasons explained below, Plaintiffs' Motion is denied.

## I. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The standard is even more strict for a "disfavored" injunction:

> [A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted).

Plaintiffs seek at least an injunction changing the status quo, *i.e.*, "the last peaceable uncontested status existing between the parties before the dispute developed." *Id.* at 798 n.3 (internal quotation marks omitted). Accordingly, Plaintiffs must make a strong showing of likelihood of success on the merits and that the balance of harms tips in their favor. Plaintiffs cannot make either showing.

## II. STATUTORY FRAMEWORK

In Colorado, a U.S. Senate candidate may seek placement on the primary election ballot through, among other methods, a petition for nomination "signed by at least one thousand five hundred eligible electors in each congressional district." Colo. Rev. Stat. § 1-4-801(2)(c)(II). Regarding its electoral laws generally (*i.e.*, without reference specifically to the signatures-per-district requirement), Colorado says that

2

"[s]ubstantial compliance with the provisions or intent of [the electoral] code shall be all that is required for the proper conduct of an election to which this code applies." *Id.* § 1-1-103(3).

### III.  BACKGROUND

The following timeline is undisputed, save for facts attributed specifically to Plaintiffs (*e.g.*, "Plaintiffs say that . . ."). The Court draws some of this information from the Colorado Supreme Court's opinion resolving a lawsuit brought by Michelle Ferrigno Warren, another U.S. Senate candidate who faced challenges obtaining the required number of signatures as the COVID-19 pandemic set in. *See Griswold v. Ferrigno Warren*, 462 P.3d 1081 (Colo. 2020) ("*Ferrigno Warren*").

**January 21.**[1]  First day that U.S. Senate candidates can collect signatures. (¶ 37.)[2]

**January 21 through first week of March.**  Plaintiffs' volunteers collect signatures with no evident problems.  (¶¶ 38–48.)

**March 5.**  Colorado officials announce the first two positive cases of COVID-19 in the state.  (¶ 50.)

**March 10.**  Governor Jared Polis declares a state of emergency due to COVID-19.  (¶ 51.)

**March 10 through March 16.**  Plaintiffs' signature-gathering efforts are significantly hampered by COVID-19.  Many volunteers choose not to go out and collect signatures, and many potential signatories are no longer willing to open their doors, talk

---

[1] All dates are in the current year, 2020.

[2] All "¶" citations, without more, are to the Complaint (ECF No. 1).

to volunteers on the streets, etc. (¶¶ 54–75.)

**March 17.**

— Deadline to submit signatures to the Secretary. (¶ 41.)

— Plaintiffs submit their signatures to the Secretary. Plaintiffs' "gross" number of signatures (*i.e.*, before the Secretary evaluates signatures for validity) is more than 1,500 signatures in Congressional Districts 1, 2, 3, and 7, but fewer than 1,500 in the other districts. (¶ 76.) Plaintiffs say they did not know how many gross signatures they had at this point in any district. (ECF No. 17 at 1–3.)

— Ferrigno Warren, another U.S. Senate candidate who did not gather the required number of signatures per congressional district, files a lawsuit in Colorado state court (specifically, Denver District Court), arguing that her efforts amounted to "substantial compliance" in light of COVID-19, and so the Secretary should be ordered to place her name on the ballot. *Ferrigno Warren*, 462 P.3d at 1082–83.

**March 25.** Governor Polis issues a statewide "stay at home" order. (¶ 53.)

**April 14.** According to Plaintiffs, they receive from the Secretary, "for the first time, . . . specific numbers for how many reviewable signatures [they] had submitted, as well as the numbers for each of the Congressional Districts." (ECF No. 17 at 3.)

**April 16.** The Denver District Court holds a hearing on Ferrigno Warren's request that the Secretary be ordered to place her name on the ballot. The Secretary concedes that "substantial compliance" was the appropriate standard, even for numerical thresholds such as signatures per congressional district. The Secretary proposes "a mathematical 'discount-rate' formula for determining substantial compliance that could be applied to evaluate not only Ferrigno Warren's signature collection efforts,

4

but also those of the other candidates whose signature collections may have been hampered by the COVID-19 pandemic." *Ferrigno Warren*, 462 P.3d at 1083. In brief, the Secretary's proposal would have lowered the 1,500-signature threshold based on the number of days in which COVID-19 made signature-gathering less effective or impossible. *Id.* Under the Secretary's formula, Ferrigno Warren would not have been in substantial compliance. *Id.*

**April 20.** Plaintiffs receive an "insufficiency notice" from the Secretary, showing fewer than 1,500 valid signatures in five of Colorado's seven congressional districts. (¶¶ 76–77.)

**April 21.** The Denver District Court issues its order in the Ferrigno Warren dispute. The court rejects the Secretary's discount-rate approach, holds that Ferrigno Warren had substantially complied (under a different standard), and orders the Secretary to put her name on the ballot. *Ferrigno Warren*, 462 P.3d at 1084.

**April 24.**

— Plaintiffs sue in Denver District Court, arguing for the same relief granted to Ferrigno Warren. (¶ 77.)

— The Secretary appeals the Denver District Court's decision regarding Ferrigno Warren directly to the Colorado Supreme Court. *Ferrigno Warren*, 462 P.3d at 1084.

**April 29–30.** The Denver District Court holds a hearing regarding Plaintiffs' lawsuit. (¶¶ 79–80.)

**April 30.** The Denver District Court rules that Plaintiffs had substantially complied with the signature requirement, and orders the Secretary to place Plaintiff Garcia on the ballot. (¶ 81.)

**May 4, 2020.**

— The Colorado Supreme Court reverses the Denver District Court's decision regarding Ferrigno Warren, holding (contrary to the Secretary's position) that the 1,500-signatures-per-congressional-district threshold is a strict requirement that may not be relaxed through a "substantial compliance" analysis.  *Ferrigno Warren*, 462 P.3d at 1084–86.

— The Secretary appeals the Denver District Court's decision in Plaintiffs' case. (¶ 83.)

**May 5.**  The Colorado Supreme Court reverses the Denver District Court's decision in Plaintiffs' case.  (¶ 84.)

**May 6.**  Plaintiffs file this lawsuit.  (ECF No. 1.)

**May 7.**  Deadline for the Secretary to certify the ballot.  (¶ 85.)

**May 16.**  County clerks must mail ballots to overseas servicemembers, as required by the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. § 20302(a)(8)(A).

## IV.  ANALYSIS

**A.    Likelihood of Success on the Merits**

1.    <u>Laches</u>

Plaintiffs have not made a strong showing of likelihood of success on the merits because they have not made a strong showing that they can overcome the Secretary's equitable defense of laches.  "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Costello v. United States*, 365 U.S. 265, 282 (1961).

6

      a.    *Lack of Diligence*

The diligence in question here is not when Plaintiffs commenced *this* lawsuit, but when Plaintiffs commenced a state-court lawsuit, seeking a "substantial compliance" ruling. A ruling against Plaintiffs in such a lawsuit is a prerequisite to a federal constitutional claim that Colorado's ballot-access laws are unconstitutionally strict.

Stated slightly differently, what Plaintiffs want from this Court is a ruling that the Constitution requires Colorado, in light of the COVID-19 pandemic, to put a candidate on the ballot if the candidate has substantially complied (in some constitutional sense) with ballot access requirements.[3] But because Colorado already has a *statutory* substantial compliance standard, a federal claim seeking *constitutional* substantial compliance is unripe until a state-court lawsuit arguing statutory substantial compliance fails (either because the court rules that the candidate is not in substantial compliance, or because—as in this case—the Colorado Supreme Court rules that substantial compliance cannot excuse explicit numerical requirements). Thus, under the circumstances, the diligence necessary to avoid the defense of laches necessarily includes filing the predicate state-court lawsuit.

Plaintiffs submitted their signature packets to the Secretary on March 17. Those signature packets were deficient as to Congressional Districts 4–6, *even if every signature was valid*. In other words, as of March 17, Plaintiffs knew (or should have known) that they would need a substantial compliance ruling in state court. Unlike

---

[3] Plaintiffs do not argue that a 1,500-signatures-per-congressional-district requirement is facially unconstitutional, nor that collecting signatures should be completely excused under the circumstances. Thus, Plaintiffs are necessarily arguing for a constitutional substantial compliance standard—a candidate must try to gather the needed signatures, and then some standard rooted in the Constitution compels Colorado to pronounce those efforts good enough.

Ferrigno Warren, they did not commence a substantial compliance lawsuit until April 24. Plaintiffs therefore did not display the diligence required to defeat a defense of laches.

Plaintiffs claim, however, that they did not know until April 14 that they had failed to gather enough signatures in Congressional Districts 4–6. This is frankly incredible. Plaintiffs provide detailed allegations about their signature-collecting efforts both before and after the COVID-19 pandemic began to affect Colorado, including statistics about rate of signature collection and numbers of signatures collected on specific days or at specific events. (¶¶ 38–48, 54–74.) Plaintiffs presumably intend to prove these allegations are true. If they succeed in so proving, it is very difficult to believe that Plaintiffs were "flying blind," so to speak, with no idea where the signature-gathering effort stood in each congressional district.

However, even if the Court accepts Plaintiffs' claim that they did not know of the deficiency until April 14, the Court would still find lack of diligence. Given the highly compressed deadlines at issue here, every hour matters. As of April 14 at the latest, Plaintiffs knew they would need to file a substantial compliance lawsuit in state court. They waited another ten days, which was precious time under the circumstances. Thus, Plaintiffs displayed a lack of diligence.

        b.    *Prejudice to the Secretary*

"Ballots and elections do not magically materialize. They require planning, preparation, and studious attention to detail if the fairness and integrity of the electoral process is to be observed." *Perry v. Judd*, 471 F. App'x 219, 226 (4th Cir. 2012). The Secretary's assertions that ballot-printing is a complex and time-sensitive process stand unrebutted. (*See* ECF No. 8 at 13–15.) A ruling in Plaintiffs' favor at this late hour would throw this process into disarray, not only because the Secretary would need to

accommodate Plaintiff Garcia, but because it would call into question whether every other candidate claiming a similar impediment should also be placed on the ballot. This could potentially jeopardize the federal statutory deadline to mail ballots to overseas servicemembers. Accordingly, the Secretary has been prejudiced by Plaintiffs' lack of diligence.

For these reasons, Plaintiffs are not strongly likely to succeed on the merits because the Secretary is likely to succeed in proving a laches defense. *Cf. Perry*, *supra*; *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 187 (D. Me. 2008) (applying laches in a similar situation).

### c.   *Other Cases Distinguishable*

Plaintiffs say that the relief they seek is supported by cases from elsewhere granting similarly urgent relief in light of COVID-19. (ECF No. 7 at 23.) The Court finds these cases inapposite.

In *Esshaki v. Whitmer*, ___ F. Supp. 3d ___, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020), the deadline at issue was an April 21 deadline to submit signatures in advance of an August 4 primary election. *Id.* at *1. Moreover, in that case, "the State conceded at oral argument that the signature-gathering due date could be moved back to May 8, 2020 without significant impairment of the State's interests." *Id.* at *7. The circumstances in *Esshaki* are not comparable to those before this Court.

In *Garbett v. Herbert*, ___ F. Supp. 3d ___, 2020 WL 2064101 (D. Utah Apr. 29, 2020), the deadline at issue was an April 13 deadline to submit signatures. *Id.* at *1. The plaintiff filed her lawsuit the same day, and the ballot certification deadline was April 29. *Id.* at *1–4. Moreover, the plaintiff had been seeking administrative redress from the relevant state officers for weeks before April 13. *See id.* Thus, the circumstances in

9

*Garbett* are also not comparable to those before this Court.

In *Libertarian Party of Illinois v. Pritzker*, ___ F. Supp. 3d ___, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020), the deadline at issue was a June 22 deadline to submit signatures for non-major-party candidates hoping to appear on the general election ballot. *Id.* at *1–2. Moreover, "the 'window' for gathering such signatures opened at nearly the same time that Governor Pritzker first imposed restrictions [due to COVID-19]." *Id.* at *4. Thus, the circumstances in *Libertarian Party of Illinois* are not at all comparable to those before this Court.

    2.    <u>No Substantial Compliance Under a Constitutional Standard</u>

Plaintiffs do not explain what sort of compliance is substantial enough for constitutional purposes, such that the Constitution requires Colorado to deem Plaintiffs' efforts good enough under the circumstances. Whatever that standard is (assuming it exists), Plaintiffs have not made a strong showing of likelihood of success.

Plaintiffs allege, at most, that the COVID-19 pandemic significantly limited their ability to obtain signatures beginning in roughly the last week before the March 17, 2020 submission deadline, subsequent to Governor Polis's state of emergency declaration on March 10, 2020. And Plaintiffs were counting on canvassing at events very close to the deadline, such as the March 14 St. Patrick's Day parade in Denver (which was cancelled due to COVID-19). (¶ 72.) Taking such risks—specifically counting on the signatures expected to be gathered in the last few days before the deadline—does not show substantial compliance. Thus, assuming a constitutional substantial compliance standard exists, Plaintiffs have not shown a strong likelihood of success that they satisfied it.

## B.     Balance of Harms & Public Interest

In analyzing whether a preliminary injunction should issue against the government, the balance-of-harms and public-interest elements of the preliminary injunction test are treated together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  For essentially the same reasons stated in Part IV.A.1.b, above, these factors tip in the Secretary's favor, not Plaintiffs'.  At this very late hour, the Secretary's interest in ensuring that ballots are timely printed outweighs even a meritorious claim under the Constitution.

Moreover, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."  *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).  If the Court were to grant the relief Plaintiffs seek, there would be "conflicting orders": one from the Colorado Supreme Court saying that Plaintiff Garcia must not be on the ballot, and one from this Court saying that she must be on the ballot.  Although the Colorado Supreme Court was interpreting Colorado election law and this Court would be interpreting the Constitution, the average voter is unlikely to pick up on that distinction.

For these reasons, Plaintiffs have not made the necessary showing under the balance-of-harms and public-interest elements of the preliminary injunction test.

## V.  CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 7) is DENIED.

11

Dated this 21st day of August, 2020, *nunc pro tunc* to the 7th day of May, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge